15283

WEAVER v. METROPOLITAN LIFE INSURANCE COMPANY

(15 S. E. (2d), 673)

*Mr. E. C. Dennis, Jr.,* of Darlington, and *Messrs. Elliott, McLean, Wardlaw & Elliott,* of Columbia, for appellant,

*Messrs. Mozingo & Bryan,* of Darlington, for respondent,

Counsel for appellant, in reply,

June 28, 1941.

The opinion of the Court was delivered by MR. ACTING ASSOCIATE JUSTICE G. B. GREENE.

This is an action for both actual and punitive damages for an alleged breach of an insurance contract accompanied by an act of fraud. Appellant on May 1, 1929, issued to respondent a policy of insurance on her life for $500.00, in consideration of a premium payment of $1.11 per month, due and payable on the first day of every month, with a grace period of thirty-one days. Relevant provisions of the policy are as follows:

"If any premium under this Policy shall not be paid when due, the Policy shall lapse, subject to the provision for Grace Period and the Non-Forfeiture Privileges as herein contained. * * *

"Revival. Should this Policy lapse for non-payment of premium, it may be revived, if not more than two years' premiums are due and a cash surrender value has not been paid, upon payment of all arrears and the presentation of evidence, satisfactory to the Company, of the insurability of the Insured."

The complaint alleges that plaintiff paid all premiums on said insurance through the month of September, 1938; that, while said insurance was in full force and effect, the defendant conceived and executed a fraudulent scheme to breach its contract with her and cause her policy to lapse by deceiving and misleading her into believing that the policy had lapsed; that in furtherance of its scheme defendant through its agents falsely represented to plaintiff that it was defendant's custom to lapse its policies every seven years and that she would be required to take a physical examination in order to have her policy revived; that a few days later defendant's agent informed her that her policy had lapsed through her own neglect; that as a result of said false representations plaintiff was persuaded and induced to submit to a physical examination by defendant's examining physician, who pronounced her then uninsurable; that shortly thereafter defendant through its said agent consummated its fraudulent scheme by delivering to her the sum of $3.33 and refusing to take said money back or to receive further premiums; and that on account of such fraudulent breach of its contract defendant has damaged her in the sum of $2,-950.00.

In its answer defendant admits that it issued to plaintiff a policy of insurance for $500.00, as alleged in the complaint, but denies all charges of fraud and deceit as therein alleged against it and its agents. The answer further alleges that plaintiff failed to pay the July, 1938, premium on her policy

within the grace period, thereby causing said policy to lapse; that on August 5, 1938, plaintiff applied for the reinstatement of her policy in accord with its terms; that upon her examination for the purpose of establishing her insurability it was not satisfied and refused to reinstate the policy and so notified plaintiff; and that the said policy has a non-forfeiture automatic paid-up value of $136.10, payable upon the death of plaintiff.

The case came on for trial before Judge E. H. Henderson and a jury at the March, 1940, term of the Court of Common Pleas for Darlington County. At the close of plaintiff's testimony defendant moved for a nonsuit and after all testimony was in moved for a directed verdict in its favor. Both of said motions were denied. The jury returned a verdict for plaintiff for $493.34, actual, and $750.00 punitive damages. On motion for a new trial Judge Henderson signed an order disposing of said motion as follows:

"It is therefore Ordered, that a new trial *nisi* be, and the same is hereby granted, unless within ten days after the filing of this order, the plaintiff shall remit on the record the sum of Three Hundred Thirty-two and 47/100 ($332.47) Dollars actual damages.

"It is further Ordered, that in the event the said sum is remitted on the record, the motion for a new trial be, and it is hereby refused."

Within ten days plaintiff complied with the terms of said order by remitting the required amount of actual damages on the record, and entered judgment for the balance of the actual damages along with the punitive damages.

Within due time defendant appealed to this Court upon five exceptions, which, according to defendant's brief, present these three questions:

1. Was there any evidence from which the jury might reasonably find that the July, 1938, premium was paid on time, or if it was not that the defendant waived late payment?

2. Was there any evidence of a fraudulent act accompanying the alleged breach of contract?

3. Is respondent estopped from maintaining this action because she signed an application for the reinstatement of her policy, submitted to a physical examination for that purpose and accepted a return of the premiums for the months of July, August and September, 1938?

In considering the first question the primary inquiry is whether or not the July, 1938, premium was paid during that month. Respondent testified that during the month of July, 1938, G. C. Little, appellant's collecting agent, came to her home for the purpose of collecting the premium for that month, and that, as she did not have the money to pay same, she told said agent that her husband would bring it to him. Respondent's husband, F. J. Weaver, testified that during the month of July, 1938, about the middle thereof, he, Pat Kelley and George Truett were going to a fish fry at Donarail and as the said G. C. Little resided on the road to that place he stopped, went upon the porch of Little's home, and there paid to Little personally the premium on his wife's insurance policy for the month of July, 1938, and received a receipt therefor, which he later turned over to his wife. He stated positively that this transaction took place during the month of July, 1938. Kelley testified that he was with F. J. Weaver on the occasion mentioned, that he saw Weaver and Little talking on the porch of Little's home, and that he saw Weaver put a paper in his pocket. Respondent testified that her husband turned the July receipt over to her and that it, along with other receipts, were taken up by appellant's agents, G. C. Little and W. A. Galloway, when they notified her that her policy could not be revived and left with her the sum of $3.33. On the other hand, Little denied that respondent's husband came to his home in July, 1938, and paid said premium as claimed by him. He admitted however that some one did leave the July premium at his home during his absence about August 3, 1938, three days after the grace period had expired. He also

admitted that respondent paid the August and September premiums thereafter, but claimed that he received and held those premiums along with the July premium upon the oral understanding that all of them would be returned to respondent if her policy could not be revived. Other evidence was offered by appellant in this connection, but from the foregoing it is clear that the question of whether or not the July, 1938, premium was paid within the grace period was a clear-cut issue of fact for the decision of the jury.

The presiding Judge charged the jury fully and clearly as to the effect of a failure to pay a premium within the time specified in the policy and instructed them as to the importance of their decision in that respect; and we must assume from the verdict of the jury, which was a general one, that they found that respondent had not defaulted in the payment of the July, 1938, premium and that appellant had wrongfully declared her policy lapsed and had breached its contract with her. The exceptions raising the first question are over-ruled.

We approach a consideration of the second question with the facts established that respondent's policy had not lapsed as claimed by appellant and that appellant had breached its contract with her. Was that breach accompanied by a fraudulent act? Respondent, a married woman, was about forty-eight years of age. Her husband was illiterate. Respondent was suffering from high blood pressure and nervousness, which, according to the examining physician, was probably the result of menopause. Respondent testified that on several occasions prior to July, 1938, she had informed appellant's agent, G. C. Little, of her condition. Little had worked for appellant for twenty years and respondent testified that she had confidence in him and would do whatever he told her to do. W. A. Galloway, who took a part in the alleged fraudulent acts, had also been with appellant for a number of years and at the time was assistant manager of its Florence district office, which embraced a number of counties.

There is evidence from which it may reasonably be inferred that G. C. Little saw respondent about August 5, 1938, and informed her that it was necessary to have her policy checked every seven years in order to keep it in force, and that by reason of such misleading information respondent was induced to sign an application for the reinstatement of her policy. There is evidence to the effect that a short time thereafter Little with W. A. Galloway called at respondent's home and told her that her policy had lapsed because her husband had paid the July premium three or four days too late and respondent was thereby induced over her protest to submit to a physical examination by appellant's physician. The evidence shows that after respondent had been declared uninsurable both Little and Galloway went to respondent's home and informed her that her policy had lapsed, that it could not be revived, and that no further premium would be received; and that upon those representations she was induced to receive back the July, August and September premiums and surrender her receipts for those months.

Little denied that he ever told respondent that her policy had to be checked every seven years, but admitted that on August 5, 1938, he told respondent that her policy had lapsed whereupon she signed an application for the reinstatement thereof. Little and Galloway admitted that a short time thereafter they went together to respondent's home and told her that her policy had lapsed and that it would be necessary for her to submit to a physical examination in order to have it revived. They testified that respondent was disturbed about the matter and objected to such an examination, but that she finally yielded. The following is from Galloway's testimony:

"Q. When did you first see Mrs. Weaver? A. I don't remember the date. I was over there working with Mr. Little. My first visit over there was in connection with this case, as well as I remember. After the company had requested an examination by the physician I went with Mr. Little and talked to Mrs. Weaver concerning an examination.

"Q. You explained to her that she must have an examination? A. That was the company's request.

"Q. What did Mrs. Weaver do? A. She seemed to be right smart disturbed about it.

"Q. Didn't want to be examined? A. Didn't want to be examined."

Both Little and Galloway admitted that after the examining physician had pronounced respondent uninsurable they went together to her home and told her that her policy could not be revived, and that no further premium would be accepted; and that after telling her that they delivered back to her the July, August and September premiums and took her receipt therefor, which they had written on the back of a blank check. In connection with that transaction respondent testified as follows:

"A. He said the policy could not be revived. He said that Dr. Willcox was good at tricks like that and I told him that I had learned that he wasn't by himself. He took out a paper and told me to sign. Mr. Weaver had told me not to sign anything, but being confused and nervous I signed.

"Q. Did he read the paper to you? A. No, sir.

"Q. Was it in your handwriting? A. No, sir.

"Q. Did he give you time to read it? A. No, sir."

It is not disputed that all of the foregoing transactions took place in the absence of respondent's husband, who had paid the July, 1938, premium when respondent was not present. Other facts and circumstances might be gleaned from the record in this connection. But in our opinion the foregoing is sufficient to require the case to be submitted to the jury on the question of whether or not fraud had been practiced upon respondent as alleged in her complaint. In passing upon the motion for a new trial the presiding Judge, who had full opportunity to observe the demeanor of the witnesses and to get the true picture of the entire matter, said:

"In this case, after carefully considering the facts, I am of opinion that there was evidence of a plan or scheme on the

part of the defendant to breach the contract, culminating in a fraudulent act accompanying such breach.

"It is true that the evidence of the defendant's witnesses was to the contrary, but that is what the jury system is for, to pass upon and decide disputed questions of fact; and I do not think that I would have been warranted in taking this question from the jury by directing a verdict at the trial, nor that I am warranted now in granting a new trial on this ground."

It having been established by the verdict of the jury that respondent was induced by fraud and deceit to sign an application for the reinstatement of her policy, to submit to a physical examination and to receive back the July, August and September, 1938, premiums, it follows that it cannot be held, as a matter of law, that those same acts on her part constituted an estoppel against her. Furthermore, it appears that the principle of estoppel was not invoked until the case reached this Court. Estoppel was not mentioned in the answer or in any of the motions made before the trial Judge, and the rulings of the trial Judge on the various motions made before him show that this question was not raised before him or passed upon by him at any time. The trial Judge did not charge the jury with respect to the principle of estoppel and no request was made for him to do so.

All exceptions are overruled and the judgment of the Circuit Court is affirmed.

MR. CHIEF JUSTICE BONHAM and MESSRS. JUSTICES CARTER, BAKER and FISHBURNE concur.